<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THOMAS O. SWANGIN, JR., | : | |
| | : | Civ. No. 03-4058 (GEB) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| PUBLIC SCHOOLS OF EDISON | : | |
| TOWNSHIP, et al., | : | |
| | : | |
| Defendants. | : | |

**<u>BROWN, Chief Judge</u>**

This matter comes before the Court upon Defendant Public Schools of Edison Township's (hereinafter "Township Defendant") Motion for Summary Judgment pursuant to Rule 56 [Docket Entry #33] and by Defendants Maryann Banks, Vincent Capraro, Frank Cangelosi and Ross Capaccio's (hereinafter "Individual Defendants") Motion for Summary Judgment pursuant to Rule 56 [Docket Entry # 36]. For the reasons discussed below, the Township Defendant and the Individual Defendants' Motions for Summary Judgment are granted.

## I.    PROCEDURAL HISTORY

The Complaint in this action was filed on August 27, 2003. The discovery period was extended several times. On December 6, 2005, United States Magistrate Judge Mark Falk directed that all depositions be completed by December 31, 2005, and set a briefing schedule for summary judgment motions. Pursuant thereto, Township Defendant and Individual Defendants

separately moved for summary judgment on February, 13, 2006, and February 14, 2006,

respectively.  Plaintiff failed to file a timely opposition.  The action was reassigned to the

undersigned on August 23, 2006.  Rather than consider the motions as unopposed, the Court

conducted several conference calls, and Plaintiff ultimately filed opposition on January 22, 2007.

Replies to Plaintiff's opposition to summary judgment were filed by all defendants on January

29, 2007, and the motions are now ready for decision.  The Court, having read and fully

considered all of the parties submissions, has decided the motions on the papers pursuant to

Federal Rule of Civil Procedure 78.

## II.    BACKGROUND

Plaintiff, an African American male, has been employed by Defendant Public Schools of

Edison Township since 1971 as a guidance counselor.  (Plt. Opp., p. 1).  The Individual

Defendants acted as Plaintiff's supervisors in various capacities throughout his employment.

Defendant Cangelosi was the principal of Edison High School where Plaintiff worked from

September 1993 until June 1997; Defendant Banks served as principal at John Adams Middle

School from 1999 until 2002; Defendant Capaccio was principal of Thomas Jefferson Middle

School where Plaintiff worked from 2002 until 2003 and Defendant Capraro was the district

superintendent from 1997 until 2005.  (Ind. Def. SOF).

From 1971 through 1982, Plaintiff worked in a counselor capacity at the J.P. Stevens

High School.  (Plt. Opp., p. 1).  During that period, Plaintiff obtain two certifications, the Student

Personnel Certificate and the New Jersey Principal/Supervisor Certificate.  (Id. at Ex. A and B).

In December, 1979, Plaintiff made his first attempt to "obtain advancement in his field" (id.) by

applying for the position of Acting Vice Principal for Edison High School.  (Id. at Ex. C).  His

2

application was denied.  (Swangin Cert.).

Thereafter, in June of 1982, Plaintiff applied for the position of Head Counselor at John P. Stevens High School.  That application was denied.  (Plt. Opp., p. 2; Exhibit C).  In May, 1988, Plaintiff applied for Head Counselor of Thomas Jefferson Middle School and was denied. (Id.).

On May 22, 1990, the principal of Herbert Hoover Middle School, Donald W. Robinson, submitted a memorandum to Plaintiff outlining "essential concerns" that he had with Plaintiff's job performance.  In particular, Mr. Robinson noted that a "prime concern" that he had with Plaintiff was his failure to communicate with staff and parents, and that Plaintiff's "tendency to use memos to staff in place of direct personal communication with them leaves much to be desired.  It is not unusual for me from time to time to have teachers show me a note that you have written and ask 'What does this mean?'  Frequently I do not know . . ."  Additionally, Mr. Robinson stated that "[a] second concern has to do with the homework response sheet Part of your PIP for this current year . . . this sheet was not clearly understood by parents . . . I myself find the sheet to be unclear."  (Township Def., Ex. F).

On December 18, 1990, the new principal of Herbert Hoover Middle School, Arlene K. Illes, submitted a memorandum to Plaintiff in which the parents of a student were dissatisfied with Plaintiff's handling of a situation.  Ms. Illes noted that "[t]here are times when we have to deal with parents who can be unreasonable and uncooperative. However, as a guidance counselor you need to use your communication skills to work with these people towards a resolution.  I do not feel that you did so in this case.  I also feel that you handled all of the students (involved in the situation) inappropriately.  Instead of diminishing and resolving the issues, you enlarged them

3

and caused greater problems.  Although my role as a principal includes resolution of conflicts, I cannot spend my time on things which a counselor should be able to handle.  I want you to know that I have serious concerns about this and will need to discuss them with you further at a conference. . ."  (Id.).

In November, 1989, and October, 1990, Plaintiff applied for the Acting Head Counselor position at Herbert Hoover Middle School and was denied.  (Id.).  In December, 1991, Plaintiff filed an EEOC complaint, claiming that he was being harassed by the principal on the basis of his race, sex, religion and age.  (Township Def., Ex. B).

On February 22, 1991, a typed notation from "principal" to Plaintiff was created.  The notation in sum and substance indicated that the principal was not notified regarding a meeting with a student's parents in which the principal "made very clear in my [previous] request to you that I be called in to [said] conference.  As I was returning to my office on Tuesday I saw you saying goodbye to them at the front door.  I was never notified, nor have I received a report as to what transpired . . . I am concerned about the way in which this was handled."  (Township Def., Ex. F).

On February 26, 1991, Plaintiff was observed by principal Arlene Illes during a conference that occurred between Plaintiff and the mother of a student at the school.  A report was crafted by Ms. Illes, in which she noted that "teachers should be made aware of [student's] home situation . . . [and the student] should have been referred to CIT immediately for intervention."  (Id.).

On December 2, 1991, Ms. Illes, principal of the Herbert Hoover Middle School, crafted a memorandum to Plaintiff.  The memorandum stated that Plaintiff had previously been asked to

meet with a student's mother and the student's science teacher.  The memorandum further stated that Plaintiff failed to meet with the mother and teacher and instead, "left the building to deliver the food baskets, a worthy cause, but not the correct choice . . . [l]ast year you had some difficulty with this parent and I am concerned that you are avoiding her and her daughter.  I brought this to your attention today in our conference and you became extremely argumentative and inappropriate.  In fact your comment to me re; Mrs. [name redacted] was, 'You better clean it up.'  In the past few months I have tried to work with you in a positive and professional manner.  I expect that from you in return.  Your last comment is totally unacceptable and confirms once again my feelings that this is not the environment for you." (Id.).

In January, 1992, Plaintiff filed two initial complaints regarding accusations against him about "an incident with a student" and the use of school supplies without permission.  (Plt. Opp., Ex. K).  Also in January, 1992, Plaintiff filed a formal grievance alleging discrimination on the basis of "race, creed, color, and sex and Association affiliation."  (Id. at Ex. L).

In May, 1992, Plaintiff applied for the position of Head Counselor at Herbert Hoover Middle School.  That application was denied.  The position was ultimately given to a Caucasian male. (Plf. Opp., p. 4).

On September 16, 1992, a memorandum was crafted by Principal Illes regarding a meeting with a teacher who had expressed concern regarding random transfers of students in and out of her classroom at Plaintiff's behest.  The memorandum went on to highlight new transfer procedures whereby the affected teacher would be consulted previously, and whereby a students request to transfer would be carefully scrutinized prior to transfer.  (Id.).

In September, 1992, Township Defendant entered into a Negotiated Settlement Agreement with Plaintiff in response to his previously filed EEOC complaint.  In the Agreement, Township Defendant agreed to treat Plaintiff as an "equal, the same as all employees, without harassment, and regardless of race, sex, religion or age."  The Agreement further stated that "[i]t is understood that this Agreement does not constitute an admission by the [Township Defendant] of any violation of Title VII and the ADEA, or the charges as alleged by [Plaintiff]."  (Id. at Ex. X).

In May of 1993, Plaintiff applied for the position of Head Counselor at Herbert Hoover Middle School as well as the Head Counselor Coordinator at Edison High School.  Both applications were denied.  (Id. at Ex. C).  It was in 1993 that Plaintiff first worked with Defendant Banks and Defendant Cangelosi (vice principal and principal of Edison High School, respectively).  In 1993, Defendant Banks, in her capacity as vice principal, determined that a student who was wearing a patch with a disparaging message could still attend a field trip that Plaintiff was chaperoning, after Plaintiff had noted and disapproved of the patch.  (Plt. Dep., pp. 129, 132).

On February 17, 1994, Defendant Banks (then assistant principal of the Edison High School), crafted a memorandum in which she instructed Plaintiff, who had failed to place a student in an appropriate class after he was disciplined, to remove the student from the class he had been placed to the appropriate class.  (Township Def., Ex. F).  In 1994, Defendant Banks became principal of the John Adams Middle School.  (Plt. Dep., p. 135).

On September 27, 1996, Defendant Cangelosi created a memorandum to Plaintiff in which he intended to "discuss several concerns that have developed over this past summer and

during the opening of school.  These concerns relate to inappropriate comments made to student

workers over the summer in guidance, a parental report that you advised him to go directly to the

Assistant Superintendent, and several errors related to processing student records and cases.

More importantly, my concerns have been heightened by your denials and distorted perspective

of the specific problems and by my review of your file which resulted in my recognition of a

similar pattern developing regarding poor professional communication and the apparent inability

to understand and follow policies and procedures." (Township Def., Ex. F).  The memorandum

went on to describe specific incidents, including several incidents of hostile language towards

students, as well as incidents of mismanagement of student schedules and/or records that resulted

in non-graduation and summer school problems for the students affected.  The memorandum

ended with the following . . . "Using the cases we reviewed as a basis, it is expected that you will

devote greater attention to accuracy and detail in processing student schedules and records . . .

under no circumstances should you engage students in conversation as you did with [names

withheld].  During the 96-97 school year, dramatic improvement is expected; or I will

recommend the withholding of your salary adjustment for 97-98."  (Id.).  Plaintiff was asked to

sign each of seven copies of the memorandum in acknowledgment of its service.

On October 2, 1996, Plaintiff crafted a brief typed notation to Defendant Cangelosi, in

which Plaintiff stated: "Please indicate the significance of my signature on the seven copies of

this document."  Handwritten notation from Defendant Cangelosi written on Plaintiff's typed

notation followed, which stated: "Tom - You should know the answer - please stop the games.

Your signature means you have seen the document."  Following Defendant Cangelosi's

handwritten notation was a handwritten reply from Plaintiff which stated: "Frank, Please have

this statement included on the copies to be signed.  Enclosed, 7 copies of reprimand.  Tom." (Id.).

In November, 1996, Plaintiff filed another EEOC complaint on the basis of racial discrimination by Defendant Cangelosi and retaliation for his prior EEOC complaint. (Complaint, Id. at Ex. O).  During his deposition, Plaintiff asserted that Defendant Cangelosi discriminated against him on the basis of race.  However, when asked whether Defendant Cangelosi discriminated against Plaintiff on the basis of religion during his deposition, Plaintiff replied: "He's a Jesuit-trained.  I don't know.  Could be.  I don't know.  There's St. Peter's Seton Hall.  St. Peter's, there's a whole thing, I'm not sure, especially football, because they always win, St. Peter's."  (Plt. Dep., p. 168).  Further, when asked in his deposition why Plaintiff was suing Defendant Cangelosi, who had not had contact with Plaintiff since 1997, Plaintiff stated:

> A.  The only answer I have is the truth is in the eyes and statements of the supervisor, quote, unquote.
> Q.  Well, you told me that you had no contact at all with Mr. Cangelosi since 1997, but you filed a lawsuit against him over five years later. My question is why?
> A.  His - his documentation was used by the Edison Township Board of Education during the EEOC mediation, charges back and forth to prove my - me incompetent attempt to prove me incompetent.
> Q.  So what you're saying is Mr. Cangelosi in some writings before the - that were submitted to the EEOC gave opinions with respect to your performance?
> A.  Yes sir.
> Q.  And you disagreed with that?
> A.  Yes, sir.
> Q.  And that's the basis for your claim against him? ***
> A.  He said - yes, I guess it's correct.  What he said, what he did, yes.

(Plt. Dep., pp. 111, 112).

In 1997, Plaintiff applied for the position of Supervisor of Guidance at Edison High School.  Plaintiff's application was subsequently denied.  (Id. at Ex. C).  On June 20, 1997, Plaintiff submitted a written correspondence to Defendant Capraro requesting a transfer from

Edison High School to "the elementary level of Guidance." (Township Def., Ex. D). In June, 1997, Plaintiff was transferred to a split assignment among three elementary schools. (Plf. Opp., p. 6). On April 8, 1999, Plaintiff submitted another request for transfer to Defendant Capraro, this time requesting that he be positioned as middle school counselor for John Adams Middle School, where Defendant Banks was principal. (Township Def., Ex. D).[1] Plaintiff worked as a counselor for the John Adams Middle school from 1999 through 2002.

On April 17, 2001, Defendant Banks entered a handwritten note on a prior typed note by Plaintiff. Defendant Banks note read as follows: "Regarding his request for comp time after I had come in . . . catch up on his work . . . [h]ad spent the entire week on the internet doing "research" rather than complete the scheduling assigned to him." (Township Def., Ex. B).

On October 18, 2001, Defendant Banks submitted a memorandum to Plaintiff summarizing background information regarding several students assigned to Plaintiff. In the memorandum, Defendant Banks stated in part: "I remain perplexed as to why you do not initiate important communication with me regarding matters such as the ones we discussed today. In the future, I urge you to discuss these matters with me prior to taking action on your own, as may of these requests require me to have consultation with a supervisor. . ." (Township Def., Ex. A).

On February 15, 2002, Defendant Banks submitted a memorandum to Plaintiff outlining concerns she had regarding Plaintiff's job performance. (Id.). Specifically, Defendant Banks cited the following "concerns": (1) the lack of effective communication with Defendant Banks as principal and supervisor; (2) the failure to conduct timely and informative meetings with the

---

[1] Plaintiff claims that his 1997 transfer request was "punitive" rather than voluntary. Plaintiff further alleges that Defendant Capraro required Plaintiff to submit the 1999 letter of request for transfer "to avoid charges of insubordination". (Plt. Opp., pp. 6-7).

teachers of the students Plaintiff was assigned; (3) the failure to timely follow-up with parents regarding concerns they had expressed for their children; and (4) the failure to follow procedures regarding appropriate placement in different programs.  (Id.).  Defendant Banks, in support of her concerns, cited to several instances.  Specifically, Defendant Banks referenced a student whose sister was dying of brain cancer.  The parents had contacted Plaintiff expressing concerns regarding the student's performance in math.  However, Plaintiff failed to timely communicate with the parents regarding the student's math performance, failed to timely communicate with the student's remaining teachers, and failed to assign the student to PAC, and to monitor the student's progress in math.  (Id.).  Additionally, Defendant Banks referenced several incidents of students who were either previously home schooled, or transferred from a different school, in which Plaintiff failed to administer the either part or all of the Terra Nova short form, to convert raw scores, to place students in PAC, or to properly record transferring grades.  (Id.).  Defendant Banks memorandum concluded as follows: "In summary, you fail to provide detailed, pertinent information on any case you discuss with me, thereby putting me at a severe disadvantage in making an informed decision on a student's behalf.  Further, you fail to afford resources to students by utilizing procedures in place, including testing for placement; you fail to make effective use of the middle school team model, especially with regard to your current sporadic and cursory involvement with the academic teams; and you fail to bring forth appropriate PAC interventions in a timely manner."  (Id.).

Plaintiff filed a third EEOC complaint on June 19, 2002, alleging racial, gender and age discrimination from 1999 through 2002 by Defendant Banks and Defendant Capraro.  (Township Def. Brf., p. 8).

In June, 2002, Plaintiff applied for the position of Supervisor of Guidance at Edison High School and was denied.  (Plt. Opp., p. 10).  In that same month, Plaintiff was transferred to a split assignment at Thomas Jefferson Middle School and Herbert Hoover Middle School.  (Indiv. Defs.' SOF, ¶ 61).  On June 11, 2002, Defendant Capraro crafted a correspondence to Plaintiff noting that Plaintiff had failed to follow the codified policy regarding a student at risk for suicide and instructing him to follow said policy in the future.  (Township Def., Ex. A).  On October 17, 2002, Defendant Capaccio, principal of the Thomas Jefferson Middle School, submitted a written summary of previous discussions Defendant Capacio had with Plaintiff regarding his performance.  (Id.).  Specifically, Defendant Capacio noted: (1) that Plaintiff had utilized telephones and computers in the school for personal use and that the telephones and computers were to be used for business purposes only; (2) that counseling in the hallways, as Plaintiff had previously done, and which had subjected the student to public knowledge of the incident, was not permitted; (3) that Plaintiff was failing to properly prepare for meetings with teachers regarding students; and (4) that Plaintiff needed to communicate with head and full time counselors at the Thomas Jefferson Middle School to better familiarize himself with the individual procedures of that school.  (Id.).

On November 13, 2002, the Edison Township Board of Education and John Adams Middle School responded to Plaintiff's June 19, 2002 EEOC complaint in the form of a written report.  The Respondents showed that Defendant Banks had hired African American employees as well as transferring an African American employee to work with her since becoming principal of John Adams Middle School.  Further, the Respondents showed that Defendant Banks had hired nine male teachers and eleven female teachers since becoming principal.  Additionally,

Defendant Banks had recommended that five female teachers and one male teacher not be renewed for teaching positions.  Finally, Respondents showed that Defendant Banks was only six years younger than Plaintiff and that the head counselor that Plaintiff claimed was being treated more favorably was four years older than Plaintiff.  (Township Def., Ex. E).

On May 29, 2003, the EEOC entered a Dismissal and Notice of Rights, finding that it was unable to establish violations based on the information provided and issuing Plaintiff a Notice of a Right to Sue within 90 days. (Township Def., Ex. F).  In August, 2003, Plaintiff was transferred to Lindendau Elementary School.  (Indiv. Defs.' SOF, ¶ 82).

In 2003, Plaintiff applied for the position of Principal of James Monroe Elementary School and for the position of Supervisor of Guidance at Edison High School in 2006.  Both applications were denied.[2]

During Plaintiff's previously referenced deposition, the following transpired:

> Q.  And do I understand that every position that you applied for from 1979 to the present you did not obtain either because of your race, your age, your religion, or your sex; is that correct?
> A.  Religion is shaky.
> Q.  That's shaky, okay.  But those other items . . .
> A.  Well, age, age, age, not age.  Because you're young in '79.  I'm young when I'm in '79.  I'm not talking about then, age; it wasn't even ten years ago.
> . . .
> Q.  Let me go back.  If I understand your earlier testimony, and the transcript speaks for itself, every position that you were denied was because of race, age, sex or religion.  Am I right?
> A.  Religion is shaky.
> Q.  Okay.
> A.  Because I wasn't going for priesthood.

_____

[2] Individual Defendants argue that Plaintiff failed to allege in the Complaint and failed to provide evidence in discovery of his efforts to obtain the positions asserted in 2002, 2003 and 2006.

(Township Def., Ex. K, pp. 240, 156).

Plaintiff's Complaint contains seven counts.  Count One alleges violations of Title VII against all defendants; Count Two alleges violations of Title 42, United States Code, Section 1983 against all defendants; Count Three alleges violations of the New Jersey Law Against Discrimination against all defendants; Count Four alleges breach of Plaintiff's employment contract against all defendants; Count Five alleges intentional infliction of emotional distress against all defendants[3]; Count Six alleges retaliation against all defendants; and Count Seven alleges discrimination in violation of the Age Discrimination in Employment Act against all defendants.

## III.    DISCUSSION

### A.    <u>Standard for a Motion for Summary Judgment</u>

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1366 (3d Cir. 1996); <u>Healy v. New York Like Ins. Co.</u>, 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), <u>cert. denied</u>, 490 U.S. 1098 (1989); <u>Hersh v. Allen Prod. Co.</u>, 789 F.2d

---

[3]  All Defendants have asserted in their respective summary judgment motions that Plaintiff cannot maintain a claim for intentional infliction of emotional distress because pursuant to N.J.S.A. 59:9-2(d), Plaintiff must have sustained permanent injury and incurred medical expenses in excess of $3,600.00 and that Plaintiff has failed to demonstrate $3,600.00 in expenditures.  Plaintiff, in response, has stated: "Plaintiff concedes the point that he has not offered any evidence of having incurred medical treatment expenses in excess of $3,600 or any expert medical report that he has sustained substantial permanent loss of bodily function."  As both parties agree that Plaintiff fails to satisfy the requirements of N.J.S.A. 59:9-2(d), the Court will grant Defendants motion and dismiss Count Five of Plaintiff's Complaint as there is no question of material fact and as defendants are entitled to judgment as a matter of law.

230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues

that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no

issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view

the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania

Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond, summary
> judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof

on a claim.  Rather, "the determination of whether a given factual dispute requires submission to

a jury must be guided by the substantive evidentiary standards that apply to the case."  Anderson,

477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported

issues identified in its motion, except those for which the non-moving party has provided

evidence to show that a question of material fact remains.  See Celotex, 477 U.S. at 324.  Put

another way, once the moving party has properly supported its showing of no triable issue of fact

and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be

"supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586, n.12; see also Anderson, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), cert. denied, 507 U.S. 912 (1993).

### B.   Statute of Limitations and Laches

_____Individual Defendants argue two separate procedural issues suggesting that the bulk if not all of Plaintiff's claims under NJLAD, Section 1983, Title VII and the ADEA are time-barred. First, Individual Defendants argue that events occurring more than two years prior to the filing of Plaintiff's Complaint are barred by the applicable statute of limitations.  Second, Individual Defendants argue that Plaintiff had knowledge of the basis for the claims of alleged harassment

15

since at least 1991, and failed to file suit until 2003, some 12 years later and that failure to file

early violates the doctrine of laches.

The United States Supreme Court has considered the difference between claims of

discrete discriminatory acts and hostile work environment claims and how the statute of

limitations should apply to each.  Specifically, the Court held:

> . . .that the statute precludes recovery for discrete acts of discrimination or
> retaliation that occur outside the statutory period.  We also hold that consideration
> of the entire scope of a hostile work environment claim, including behavior
> alleged outside the statutory time period, is permissible for the purpose of
> assessing liability, so long as an act contributing to the hostile work environment
> takes place withing the statutory time period.

Nat'l Railroad Passenger Corp., v. Morgan, 536 U.S. 101, 105 (2002) (holding that a Title VII

plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within

the appropriate 190 or 300 day period, but a charge alleging a hostile work environment will not

be time barred if all acts constituting the claim are part of the same unlawful practice and at least

one act falls within the filing period); see also Shepard v. Hunterdon Developmental Ctr., 174

N.J. 1 (2002) (adopting Morgan standard for NJLAD claims); Cito v. Bridgewater Township

Police Dept., 892 F.2d 23, 25 (3d Cir. 1989) (" . . . action for an injury to the person caused by a

wrongful act . . . must be convened with two years of accrual of the cause of action" as applied to

a § 1983 claim); Zipes v. Trans World Airline, Inc., 455 U.S. 385, 394 (1982) (for ADEA claims,

a 300 day period similar to Title VII is applied as the statute of limitations).

Here, Plaintiff filed his Complaint on August 27, 2003.  The first line of the first page of

Plaintiff's Complaint states that "[t]his is an action brought due to discrimination, hostile work

environment and retaliation . . ."  Further, Plaintiff's Complaint alleges, on page 7, paragraph 34,

16

that on August 19, 2003, Plaintiff received a letter from Defendant Capraro which informed Plaintiff that he would be transferred involuntarily, conduct which Plaintiff has consistently plead throughout his Complaint as evidence of discrimination, retaliation and a hostile work environment.

Plaintiff concedes, in his opposition to the Individual Defendants' motion for summary judgment, that "for purposes of discrete discriminatory act[s], only those acts falling within the statutory time frame of two years prior to the filing of Plaintiffs complaint are relevant." (Plt. Opp., p. 13). However, Plaintiff asserts, "the facts of this case support Plaintiff's hostile work environment claim." (Id.).

In accordance with Morgan, Plaintiff can utilize incidents outside the statutory time period to support his claim of hostile work environment, because he has asserted incidents contributing to the claim which took place within the statutory time period. Further, Plaintiff is limited to those acts which fall within the prescribed statutory time frame in his assertion of Title VII, ADEA, NJLAD and § 1983 claims.[4]

Individual Defendants next assertion regarding the doctrine of laches lacks merit. Specifically, as Individual Defendants note, "[t]he defense of laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Bratton v. Bethlehem Steel Corp., 649 F.2d 658, 666 (9th Cir. 1980). Generally, courts do not set a particular length of delay that should be considered unreasonable, but "will look to the facts of each case to determine reasonableness." EEOC v. Liberty, 584 F.2d

---

[4] On that same basis, any claims against Defendant Cangelosi except for Plaintiff's claim of a hostile work environment must be barred under the applicable statute of limitations as Defendant Cangelosi had neither direct nor indirect contact with Plaintiff after 1997.

853, 858 (8th Cir. 1978).  To satisfy the lack of diligence standard, the standard by which

Individual Defendants assert Plaintiff fails, the Individual Defendants must demonstrate that

Plaintiff was aware of the discrimination and/or the impact or potential impact the alleged

discrimination had on Plaintiff.  Kansas v. Colorado, 514 U.S. 673, 688-89 (1995).

In the instant action, Plaintiff filed three separate EEOC complaints regarding the

"negative" treatment he alleges, one in 1991, another in 1996 and yet another in 2002.  If one

considers the date of the last EEOC complaint, which was responded to on May 29, 2003, and

considering the date Plaintiff filed the instant Complaint, which was August 27, 2003, the

doctrine of laches can hardly be considered applicable.  However, if one considers the date of the

first EEOC complaint, Plaintiff waited 12 years before filing the instant Complaint, an amount

that could and most certainly would be considered an "unreasonable" amount of time.

What Individual Defendants fail to acknowledge, however, is that Plaintiff's first EEOC

complaint ended in a settlement, in which defendants (although denying guilt) agreed not to

discriminate on the basis of sex, race, age or religion.  Plaintiff, in accordance with the settlement

agreement, continued to work for Defendants and continued to apply for higher-titled positions.

Further, Plaintiff's 1996 EEOC complaint was never heard.  It was only on May 29, 2003, after

he filed his third EEOC complaint in 2002, that Plaintiff received a right to sue notice.  The

Court concludes that these efforts demonstrate due diligence, prohibiting a finding of dismissal

pursuant to the doctrine of laches.

C.   **Plaintiff's Discrimination Claims**

Plaintiff's Complaint alleges discrimination, hostile work environment and retaliation

based on Plaintiff's race, age, gender and religion pursuant to NJLAD, Title VII and the ADEA.

18

Discrimination claims brought under Title VII, NJLAD and ADEA must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later clarified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).[5]  The framework consists of three steps.  First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination.  Hicks, 509 U.S. at 506.  To establish such a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered from an adverse employment decision; and (4) the employer sought to or did fill the position with a similarly qualified person who was not a member of the protected class.  McDonnell Douglas at 802.  In Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-97 (3d Cir. 1997), the Third Circuit described the type of adverse employment decision that is actionable under Title VII.  The adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'"  Id.  (citing and quoting 42 U.S.C. § 2000e-2(a)(1) and (2)).

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions.  Hicks,

---

[5]  "Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim."  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).  Likewise, analysis of a claim made under ADEA generally follows a slightly modified version of the McDonnell test.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  Therefore, the analysis of Plaintiff's Title VII claim of discrimination on the basis of race, age and religion applies to Plaintiff's identical claims under NJLAD and ADEA.

509 U.S. at 507; Burdine, 450 U.S. at 254; McDonnell Douglas, 411 U.S. at 802.

If the defendant satisfies this burden, the reviewing court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendant's articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination."  Hicks, 509 U.S. at 507-08; Burdine, 450 U.S. at 253.

A plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendant or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendant's actions.  Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994). Although the evidentiary burdens shift between the plaintiff and the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

In this case, Plaintiff has failed to set forth a prima facie case of discrimination as required by McDonnell Douglas.  Plaintiff's claims for discrimination are based on denials of promotions, involuntary transfers, and harassing conduct including criticism of his work performance.  Plaintiff contends that he was not promoted and was transferred involuntarily due to his race, gender, age and/or religion.

However, Plaintiff fails to demonstrate that he suffered from an "adverse employment decision" based upon discrimination.  Specifically, during the course of his 34 years of employment with Defendants, Plaintiff has never been suspended, furloughed or terminated. Plaintiff was never demoted, his salary was never reduced and his benefits were never reduced.

20

When Plaintiff asked for a transfer, his request was granted.  Plaintiff has always received the standard applicable pay increments.  (Plt. Dep., pp. 201-203).  Despite the alleged discrimination, Plaintiff received tenure at the Edison Public School District in or about 1974, and no tenure charges have ever been brought against him. (Plt. Dep., pp. 240-243).

Plaintiff alleges that he was involuntarily transferred to different schools within the district throughout his career with Defendant Edison Public Schools.  While there is evidence that Plaintiff was transferred on five occasions, there is also evidence that at least two of those transfers were at Plaintiff's request.  Further, there is no evidence provided by Plaintiff that demonstrates that the remaining three transfers over the course of 34 years of employment were punitive in nature.  Rather, Plaintiff puts forth vague accusations including claims that Defendant Capraro discriminated against him by following "the district's policy, stated or unstated, – well, it's not stated.  Unstated policy that black employees will not be promoted; they're lucky if they get tenured" and subjecting him to involuntary transfers.[6]  (Id. at p. 209-210).  Acts such as transfers do not constitute a adverse employment actions unless they result in a "significant change in employment status," including situations such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Plaintiff has not provided this Court with any evidence that these transfers resulted in a decrease in pay or benefits or any other significant change in employment status.  Further, despite these transfers, Plaintiff maintained his position as a guidance counselor.___

---

[6]  Of course, as the Court previously discussed, Plaintiff did in fact receive tenure in 1974.

Other situations involving alleged discrimination by Defendants include a claim that Defendant Cangelosi discriminated against Plaintiff on the basis of his religion. Plaintiff stated "He's a Jesuit-trained. I don't know. Could be. I don't know. There's St. Peter's, Seton Hall. St. Peter's there's a whole thing, I'm not sure, especially football, because they always win, St. Peters." (Id. at p. 168). Plaintiff has not had any contact with Defendant Cangelosi since 1997, yet explained that he brought this suit against him because of his evaluations of Plaintiff's performance. (Id. at p. 111). Plaintiff stated that Defendant Cangelosi's "documentation was used by the Edison Township Board of Education during the EEOC mediation, charges back and forth to prove my – me incompetent attempt to prove me incompetent" and Plaintiff disagreed with his evaluation. (Id.). Plaintiff's claims against Defendant Cappaccio were based on incidents such as not providing Plaintiff with an office while working a split shift at one of the school districts and receiving criticism regarding his work performance. (Id. at pp. 113-115). Plaintiff has not connected any of these acts or set forth any more specific discriminatory conduct based on his race, gender, age or religion.

Plaintiff therefore fails to satisfy the first prong of the McDonnell Douglas test. However, assuming Plaintiff did satisfy the first prong of the test, he nevertheless cannot satisfy the third prong of the test. As previously discussed, when the initial prima facie case for discrimination is successfully demonstrated, the burden then shifts to Defendants to show through admissible evidence a nondiscriminatory reason for its actions. Burdine, 450 U.S. at 255; Salkovitz v. Pioneer Electronics (USA), Inc., 2005 WL 1638131 at * 4 (D.N.J. 2005). The burden for Defendants is "rather light", and ordinarily, unless silent, a defendant will almost always meet its burden. Id. In the case at bar, Defendants assert that Plaintiff was not denied

advancement because of race, gender, age or religion, but because of performance issues that every school and principal he worked for had.  Defendants evidence this by pointing out several incidents and written evaluations and/or letters to Plaintiff discussing performance issues.

The Court therefore concludes that Defendants have satisfied the second prong of the McDonnell Douglas test.  The burden must now shift back to Plaintiff to demonstrate that the reasons given by Defendants as to why Plaintiff was transferred and not promoted were "pretextual."  Again, Plaintiff fails to make such a showing.

To show pretext, Plaintiff must provide evidence that casts doubt on Defendants reasoning and from which "a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes at 764.  In essence, as defined in Salkovitz, 2005 WL 1638141 at * 6, a court must determine whether the actual reason for Defendants failure to promote and transfers were discriminatory in nature.  However, Plaintiff need not show that age, race, gender and/or religion were the sole basis in the alleged discrimination, but rather, that it was a factor in the decision making process.  Abrams v. Lightolier, Inc., 50 F.3d 1204, 1212 (3d Cir. 1995).

In the case at bar, Plaintiff fails to demonstrate that Defendants actions were discriminatory in nature, or that their propounded reasons are pretextual.  Over the course of 34 years, it is quite reasonable to assume that an individual will be transferred as needed within the school system, regardless of race, gender, age or religion.  Further, Plaintiff does not offer any evidence that the individuals that were hired instead of him were not more qualified for the position than he.  In actuality, Plaintiff assumes that because he was not promoted, his race, or

gender, or age, or religion must be the reason.  More than an assumption is needed, however, to support a discrimination claim.

As such, the Court concludes that even if Plaintiff had satisfied the first prong of the McDonnell Douglas test, he nevertheless fails the third prong.  Further, Defendants set forth nondiscriminatory reasons for their failure to promote Plaintiff, as well as why he was transferred.  Therefore, Plaintiff has failed to demonstrate a question of material fact, and Defendants are entitled to judgment as a matter of law.  Plaintiff's claims regarding discrimination on the basis of sex, age, race and religion are dismissed.

### D.   Retaliation

Plaintiff also makes a claim that he was subjected to retaliation in response to the grievances he filed with the EEOC regarding Defendants' alleged discrimination.  (Plt. Complaint, ¶ 40).  The burden-shifting requirements of McDonnell Douglas similarly apply to retaliation cases.  Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d. Cir. 1997).  Therefore, Plaintiff must show that (1) he engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the employee's protected activity and the employee's adverse action.  Schellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003).  If Plaintiff is able to establish these elements of his *prima facie* case, the burden then shifts to Defendants to advance a legitimate, non-retaliatory reason for its adverse employment action.  Id.  If Defendants satisfy that burden, then Plaintiff must prove that "retaliatory aminus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process."  Id.  In order to constitute an adverse employment action, the "retaliatory conduct must be serious

and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d 1997); Jensen v. Potter, 435 F.3d 444, 448 (3d Cir. 2006) ("[r]etalitory conduct other than discharge or refusal to rehire violates Title VII when it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities or adversely affect[s] his status as an employee")(internal quotations omitted). As with Plaintiff's discrimination claim above, the same analysis applies for Plaintiff's claims under state and federal law. Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).

Again, Plaintiff fails to establish that he has suffered an adverse employment action. Plaintiff claims that he was subjected to transfers, however, the record is devoid of any evidence that the transfers were punitive or affected Plaintiff's status as an employee. Defendants contend that transfers cannot be considered adverse employment actions since they did not result in a reduction in salary or benefits and Plaintiff maintained the same position throughout his career. Defendants also assert that employers are granted discretion when rendering employment decisions, and it is not the Court's role to second-guess an employer's business judgment as to who is a more qualified candidate for a position. Dungee v. Northeast Foods, Inc., 940 F.Supp. 682 (D.N.J. 1999); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981).

Plaintiff has not supported his allegations of retaliation with evidence of Defendant's discriminatory intent and has not raised a genuine issue of fact as to whether his employer's proffered reasons were not the actual reasons for the action. Edwards v. Schlumberger-Wells Services, 984 F. Supp. 264, 278 (D.N.J. 1997); Burdine, 450 U.S. at 253. Plaintiff has not provided any evidence to substantiate his claim that the transfers at issue were motivated by

discrimination and that legitimate business judgment was not exercised on behalf of the

employer's.  In fact, as previously stated, Plaintiff received tenure in 1974 and since being hired

in 1971 no tenure charges have ever been brought against him, he has never been suspended,

furloughed or terminated and he has always received standard increments.  Based on the

supported facts provided by Defendants and the lack of evidence to support Plaintiff's claim,

Defendants are entitled to summary judgment with respect to Plaintiff's retaliation claims.

**E.**     **Hostile Work Environment**

Plaintiff alleges that he was subjected to a hostile work environment throughout his

employment with Defendant Edison Township Public Schools.  According to Harris v. Forklift

Sys., Inc., 510 U.S. 17, 21 (1993), Title VII permits individuals to bring claims when they are

forced "to work in a discriminatorily hostile or abusive environment."  These types of claims find

basis in the "notion that discriminatory ridicule or abuse can so infect a workplace that it alters

the terms or conditions of the plaintiff's employment."  Jensen, 435 F.3d at 449.

In order to establish a claim based on a hostile work environment, a plaintiff must prove

that: (1) he suffered intentional discrimination because of his protected activity; (2) the

discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) it

would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for

employer liability is present.  Jensen, 435 F.3d at 449.  The harassment experienced by Plaintiff

must be "so severe or pervasive that it alters the conditions of the victim's employment and

creates and abusive environment."  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).

Plaintiff's hostile work environment claim fails as a matter of law.  Plaintiff's allegations

regarding harassment involve evaluations and criticism he received while performing his job as a

guidance counselor.  For example, Plaintiff claims that Defendant Banks harassed him by making "comments about me on the computer, belittled my work on the computer, that I was daydreaming or not doing my job, that I was, like, playing on the computer, and that's supposed to be one of my skills, that's why they said I was sent there.  Things like that."  (Plt. Dep., p. 180).  However, as previously discussed, Defendant Banks had expressed that Plaintiff had spent an entire week on the computer addressing personal business instead of working, and that as a result, Plaintiff was forced to come in during the weekend to make up his work, then requested compensatory time as reimbursement for the weekend work that he himself caused.  There is no evidence in discrimination in such a scenario, but rather, the diligent work of a supervisor ensuring that her staff is working during work hours.

Plaintiff also claims that Defendant Banks made certain remarks about him and his job performance because Plaintiff is African American and "she knows she could get away with it." (Plt. Dep., p. 195).  Specifically, Plaintiff alleges that he was "indirectly accused of killing a two year old", in reference to the sister of a student whose parents had notified Plaintiff of the situation.  (Plt. Dep., p. 193) (see *supra*, p. 10).  However, when asked to explain how Defendant Banks had accused him of the two-year-olds death, Plaintiff was unable to explain himself.  The relevant passage of the deposition in this regard is as follows:

> Q.     And what occurred in or about February or March of which triggered your filing a grievance?
> A.     Indirectly I was accused of killing a two-year-old.  If you read it right, it's like I killed this brain-tumored two-year-old sister of a sixth-grade student.
> Q.     And who accused you of that, or who did you perceive to have accused you of - -
> A.     That's a secret memo that eventually cam to my knowledge through the personnel records, but at the time, I didn't see the secret memo to the super's office.

Q.     Who wrote the secret memo?

A.     Dr. Banks.  Banks, she's a doctor by name, doctor of education.

. . .

Q.     How did you come to see what you've referred to as the secret memo?

A.     Must have been an EEO - - I paid $80 for EEOC's file.  I remember - - I think that's where it came from.

Q.     Did you know about it at the time?

A.     No.

Q.     When - -

A.     But I just knew what was happening, but I didn't see it written out.  I knew something was happening.

Q.     Are you saying that Dr. Banks accused you in this memo of killing a two-year-old or being responsible for the death of a two-year-old?

A.     The word is responsible.

Q.     Yes?

A.     Yes.

Q.     And under what circumstances did you understand that Dr. Banks was claiming that you were responsible for the death of a two-year-old?

A.     She never said it that way.  She didn't say Swangin killed a two-year-old that he's never seen or been in the presence of.  She didn't say.  It's - - if you read her stuff, you'll get the point.  It's like - - it's - - she's an English major.  She says a lot of things, and then all of a sudden in your brain in the novel, you have this impression, character impression of a scene, but she doesn't have to say it.  It's like you build and then you come to that conclusion.

Q.     As you sit here today, is there any specific phrase or sentence that you can recall that's in that document which leads you to conclude that she was claiming that you were somehow responsible for the death of a two-year-old that you never met?

A.     It's more a case of why the father of the child was out of sorts.  The tumor surfaced, you know, around Christmastime of 2002.  And somehow the father - - I don't know how to clip this, because this is convoluted, but if you've got patience, I'll deal with it.

Q.     Let me see if I can hone in on some of this.  Are you claiming that Dr. Banks made this accusation, which you understood to be an accusation, because you're African-American?

A.     She - - yes, because she knows she could get away with it.

Here as well, Plaintiff fails to show that Defendant Banks ever blamed, accused or held

Plaintiff responsible for the two-year-olds death.  Further, as the child's death was the result of a

brain tumor, any attempt by Defendant Banks or any other defendant to suggest that Plaintiff was

28

responsible would simply be nonsensical.  Defendant Banks in fact did not blame Plaintiff for two-year-olds death, but rather, reprimanded Plaintiff for failing to notify the student's teachers regarding the situation, including the math teacher, a subject the student was struggling in and the basis for the original call by the parent to Plaintiff.  This does not in any way demonstrate that Defendant Banks reprimands against Plaintiff, for example, were based on his race, gender, age or religion, but rather, does demonstrate that the reprimands Plaintiff received, not only from Defendant Banks, but from all Individual Defendants, were the result of poor work performance on Plaintiff's part.

Further, however perceived by Plaintiff, he nevertheless fails to show that the incidents of reprimand were so severe or pervasive as to alter his work environment.  As such, Plaintiff fails to satisfy the first and second requirements to establish a hostile work environment claim as set forth in Jensen and Defendants are entitled to summary judgment regarding all hostile work environment claims.

    **F.**    **§ 1983**

In addition to Plaintiff's discrimination claims, Plaintiff alleges that all Defendants violated his right to equal protection under 42 U.S.C. §1983, that Defendant Edison Public Schools breached Plaintiff's employment contract and that all Defendants caused intentional infliction of emotional distress.

First for consideration is Plaintiff claims that his civil rights have been violated pursuant to 42 U.S.C. §1983.  Civil liability may be imposed under 42 U.S.C. § 1983 upon "any person who, acting under the color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States."  Gruenke v. Seip, 225 F.3d 290,

298 (3d Cir. 2000).  Section 1983 does not create any new rights, but only provides a remedy for "the violation of a federal constitutional or statutory right."  Id. (citing Baker v. McCollan, 443 U.S. 137, 144, n.3 (1979).  To establish a federal claim under § 1983, Plaintiff must show that the conduct of the defendants, under color of state law, deprived him of a federal constitutional or statutory right.  See Gruenke, 225 F.3d at 298.  Here, however, Plaintiff fails to demonstrate a deprivation of a constitutional right.  Plaintiff has successfully availed himself of the grievance procedures available to himself three times over by filing three separate EEOC complaints.  Further, after receiving his right to sue letter, Plaintiff did in fact sue.  Therefore, the Court concludes that there is no evidence present to show any deprivation of Plaintiff's rights.

Further, the basis for a § 1983 claim may only coexist with a claim of discrimination when it rests on a substantive constitutional right (i.e., if it is actionable under the Fourteenth Amendment).  See Bair v. City of Atlantic City, 100 F.Supp.2d 262, 267 (D.N.J. 2000). Therefore, because age discrimination is not, per se, a constitutional violation, but rather, a statutory one,  "ADEA preempts other federal remedies for age discrimination, including § 1983."  See Watson v. Board of Directors of William Penn Sch., 2006 WL 2506359 at *5 (E.D.Pa. 2006) (citing Barlieb v. Kutztown Univ. of Pa. State Sys. Of Higher Educ., Civ. A. No. 03-4126, 2003 U.S. Dist. Lexis 25178 (E.D.Pa. Dec. 1, 2003); Purtill v. Harris, 658 F.2d 134, 138 (3d Cir. 1981)).  Indeed, as with ADEA, Plaintiff's claims for retaliation and hostile work environment, "which was created by Title VII and is not recognized under constitutional principles, may not be pursued through Section 1983."  Bair at 267 (citing Long v. Laramie County Community College, 840 F.2d 743, 752 (10th Cir. 1988); Day v. Wayne County Board of

Auditors, 749 F.2d 1199, 1205 (6th Cir. 1984)).[7]

However, separate and apart from whether Plaintiff can procedurally sue under both §

1983 and Title VII, it is inescapable that Plaintiff's § 1983 claim must, as a matter of law, fail, as

Plaintiff has failed to demonstrate, as previously discussed that the conduct of defendants

violated any of Plaintiff's constitutional or statutory rights.  Instead, the facts, even drawing all

inferences in favor of Plaintiff, merely indicate the discipline of a tenured employee who failed to

follow his supervisors' instructions.  Plaintiff has therefore failed to present this Court with any

evidence of a § 1983 violation.  As such, Plaintiff's § 1983 claims shall be dismissed as Plaintiff

has failed to demonstrate a question of material fact, and defendants are entitled to judgment as a

matter of law.

## G.   Contract Claims

Plaintiff also claims that Defendant Edison Public Schools breached his employment

contract by failing to act in good faith.  (Plt. Complaint, Count IV).  Plaintiff has presented no

evidence to support this claim, and has failed to avail himself of the proper administrative

procedures available to him within the school system.  As Township Defendants note, a contract

claim must travel through administrative channels, starting with Plaintiff's immediate supervisor,

and so on up the ladder, up to and including arbitration.  There is no evidence presented by

Plaintiff that he engaged in any of the administrative remedies.  Further, Plaintiff has failed to

demonstrate that there was a breach of contract.  For example, Plaintiff offers nothing to suggest

that any of the acts taken by Defendants were in violation of his employment contract.

---

[7] Conversely, both gender and religion are constitutionally recognized and Plaintiff
properly sued under both section 1983 and Title VII.

Therefore, the Court concludes that there is no question of material fact and that Defendants are entitled to judgment as a matter of law.

**III.  CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment are granted.  An appropriate form of order accompanies this Memorandum Opinion.


Dated: April   30  , 2007


s/Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.